UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 02-21734-CIV-SEITZ/BANDSTRA

ACCESS NOW, INC., a Florida
non-profit corporation, and
ROBERT GUMSON, individually,

    Plaintiffs,

vs.

SOUTHWEST AIRLINES, CO.,
a Texas corporation,

    Defendant.
_____/



## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

THIS MATTER is before the Court on Defendant Southwest Airlines, Co.'s ("Southwest") Motion to Dismiss Plaintiffs' Complaint [DE-11]. Plaintiffs, Access Now, Inc. ("Access Now"), a non-profit, access advocacy organization for disabled individuals, and Robert Gumson ("Gumson"), a blind individual, filed this four-count Complaint for injunctive and declaratory relief under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* Plaintiffs contend that Southwest's Internet website, southwest.com, excludes Plaintiffs in violation of the ADA, as the goods and services Southwest offers at its "virtual ticket counters" are inaccessible to blind persons. Southwest has moved to dismiss Plaintiffs' Complaint on the grounds that southwest.com is not a "place of public accommodation" and, therefore, does not fall within the scope of Title III of the ADA. The Court has considered the parties' thorough papers, the extremely informative argument of counsel, and the exhibits presented during oral argument. For the reasons stated below, the Court will grant Southwest's motion to dismiss.

### Background

Having found that nearly forty-three million Americans have one or more mental or physical disabilities, that such individuals continually encounter various forms of discrimination, and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities

the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous," Congress enacted the ADA in 1990. Pub. L. No. 101-336, § 2(a), 104 Stat. 327, 328. Congress' stated purposes in enacting the ADA were, among other things, to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." Id. Among the statutorily created rights embodied within the ADA, is Title III's prohibition against discrimination in places of public accommodation. 42 U.S.C. § 12182(a).

Since President George Bush signed the ADA into law on July 26, 1990, this Nation, as well as the rest of the world, has experienced an era of rapidly changing technology and explosive growth in the use of the Internet. Today, millions of people across the globe utilize the Internet on a regular basis for communication, news gathering, and commerce. Although this increasingly widespread and swiftly developing technology provides great benefits for the vast majority of Internet users, individuals who suffer from various physical disabilities may be unable to access the goods and services offered on many Internet websites. According to Plaintiffs, of the nearly ten million visually impaired persons in the United States, approximately 1.5 million of these individuals use the Internet.

In an effort to accommodate the needs of the visually impaired, a number of companies within the computer software industry have developed assistive technologies, such as voice-dictation software, voice-navigation software, and magnification software to assist visually impaired persons in navigating through varying degrees of text and graphics found on different websites. However, not only do each of the different assistive software programs vary in their abilities to successfully interpret text and graphics, but various websites also differ in their abilities to allow different assistive technologies to effectively convert text and graphics into meaningful audio signals for visually impaired users. This lack of coordination between website programmers and assistive technology manufacturers has created a situation where the ability of a visually impaired individual to access a website depends upon the particular assistive software program being

used and the particular website being visited.[1]

In light of this rapidly developing technology, and the accessibility problems faced by numerous visually impaired Internet users, the question remains whether Title III of the ADA mandates that Internet website operators modify their sites so as to provide complete access to visually impaired individuals.[2] Because no court within this Circuit has squarely addressed this issue, the Court is faced with a question of first impression, namely, whether Southwest's Internet website, southwest.com, is a place of public accommodation as defined by the ADA, and if so, whether Title III of the ADA requires Southwest to make the goods and services available at its "virtual ticket counters" accessible to visually impaired persons.

Southwest, the fourth largest U.S. airline (in terms of domestic customers carried), was the first airline to establish a home page on the Internet. See Southwest Airlines Fact Sheet, at http://www.southwest.com/about_swa/press/factsheet.html (Last visited Oct. 16, 2002). Southwest's Internet website, southwest.com, provides consumers with the means to, among other things, check airline fares and schedules, book airline, hotel, and car reservations, and stay informed of Southwest's sales and promotions. Employing more than 35,000 employees, and conducting approximately 2,800 flights per day, Southwest reports that "approximately 46 percent, or over $500 million, of its passenger revenue for first quarter 2002

---

[1] Although it appears that no well-defined, generally accepted standards exist for programming assistive software and websites so as to make them uniformly compatible, Plaintiffs provided the Court with a copy of the Web Content Accessibility Guidelines 1.0, W3C Recommendation 5-May-1999, produced by the Web Accessibility Initiative. See Web Content Accessibility Guidelines 1.0, at http://www.w3.org/TR/WCAG10/ (Last visited Oct. 16, 2002). While "these guidelines explain how to make Web content accessible to people with disabilities," the guidelines further note that they do "not provide specific information about browser support for different technologies as that information changes rapidly." Id. Moreover, not only are these guidelines over three-years old, but there is no indication that the Web Accessibility Initiative, which "pursues accessibility of the Web through five primary areas of work: technology, guidelines, tools, education and outreach, and research and development," is a generally accepted authority on accessibility guidelines. See About WAI, at http://www.w3.org/WAI/about.html (Last visited Oct. 16, 2002).

[2] Some commentators, while recognizing the paucity of case law in this area, have suggested that Internet websites fall within the scope of the ADA. See, e.g., Jeffrey Scott Ranen, Note, Was Blind But Now I See: The Argument for ADA Applicability to the Internet, 22 B.C. Third World L.J. 389 (2002); Adam M. Schloss, Web-Sight for Visually-Disabled People: Does Title III of the Americans with Disabilities Act Apply to Internet Websites?, 35 Colum. J.L. & Soc. Probs. 35 (2001); Matthew A. Stowe, Note, Interpreting 'Place of Public Accommodation' Under Title III of the ADA: A Technical Determination with Potentially Broad Civil Rights Implications, 50 Duke L.J. 297 (2000); Jonathan Bick, Americans with Disabilities Act and the Internet, 10 Alb. L.J. Sci. & Tech. 205 (2000).

was generated by online bookings via southwest.com." Id. According to Southwest, "[m]ore than 3.5 million people subscribe to Southwest's weekly Click 'N Save e-mails." Id. Southwest prides itself on operating an Internet website that provides "the highest level of business value, design effectiveness, and innovative technology use achievable on the Web today." Id.

Despite the apparent success of Southwest's website, Plaintiffs contend that Southwest's technology violates the ADA, as the goods and services offered on southwest.com are inaccessible to blind persons using a screen reader.[3] (Compl. ¶4). Plaintiffs allege that although "southwest.com offers the sighted customer the promise of independence of on-line airline/hotel booking in the comfort and safety of their home...even if a blind person like [Plaintiff] Gumson has a screen reader with a voice synthesizer on their computer, they are prevented from using the southwest.com website because of its failure to allow access." (Compl. ¶4). Specifically, Plaintiffs maintain that "the southwest.com website fails to provide 'alternative text' which would provide a 'screen reader' program the ability to communicate via synthesized speech what is visually displayed on the website." (Compl. ¶11). Additionally, Plaintiffs assert that the southwest.com website "fails to provide online forms which can be readily filled out by [Plaintiffs] and fails to provide a 'skip navigation link' which facilitates access for these blind consumers by permitting them to bypass the navigation bars on a website and proceed to the main content." (Compl. ¶12).

Plaintiffs' four-count Complaint seeks a declaratory judgment that Southwest's website violates the communication barriers removal provision of the ADA (Count I), violates the auxiliary aids and services provision of the ADA (Count II), violates the reasonable modifications provisions of the ADA (Count III), and violates the full and equal enjoyment and participation provisions of the ADA (Count IV).[4] Plaintiffs

---

[3] Plaintiffs claim that although purchasing tickets at southwest.com is "technically possible, plaintiffs found purchasing a ticket to be extremely difficult..." (Compl. at 7). Plaintiffs do not argue that they are unable to access such goods and services via alternative means such as telephone or by visiting a particular airline ticket counter or travel agency.

[4] Plaintiffs' Counsel informed the Court that Plaintiffs made no effort to resolve this dispute prior to filing their Complaint. (Tr., Oct. 16, 2002). Although the law does not require Plaintiffs to confer with Southwest prior to filing this action, in light of Plaintiffs' Counsel's discussion of the proactive measures that other companies, such as Amazon.com, have taken to modify their websites to make them more accessible to visually impaired persons, it is unfortunate that Plaintiffs made no attempt to resolve this matter before resorting to litigation.

ask this Court to enjoin Southwest from continuing to violate the ADA, to order Southwest to make its website accessible to persons who are blind, and to award Plaintiffs attorneys' fees and costs. Southwest has moved to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6). The Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## Discussion

**A.     Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides that dismissal of a claim is appropriate when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)). At this stage of the case, the Court must accept Plaintiffs' allegations in the Complaint as true and view those allegations in a light most favorable to Plaintiffs' to determine whether the Complaint fails to state a claim for relief. S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1298 (11th Cir. 2000).

**B.     Plaintiffs Have Failed to State a Claim Upon Which Relief Can be Granted**

The threshold issue of whether an Internet website, such as southwest.com, is a "place of public accommodation" as defined by the ADA, presents a question of statutory construction. As in all such disputes, the Court must begin its analysis with the plain language of the statute in question. Rendon v. Valleycrest Prods., Ltd., 294 F.3d 1279, 1283 n. 6 (11th Cir. 2002) (citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)). The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Rendon, 294 F.3d at 1283 n. 6. (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). A court need look no further where the statute in question provides a plain and unambiguous meaning. Rendon, 294 F.3d at 1283 n. 6.

### 1. Southwest.com is Not a "Place of Public Accommodation" as Defined by the Plain and Unambiguous Language of the ADA

Title III of the ADA sets forth the following general rule against discrimination in places of public accommodation:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or operates a *place of public accommodation.*

42 U.S.C. § 12182(a) (emphasis added).

The statute specifically identifies twelve (12) particularized categories of "places of public accommodation." 42 U.S.C. § 12181(7). "Public accommodations" include:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
>
> (G) a terminal, depot, or other station used for specified public transportation;
>
> (H) a museum, library, gallery, or other place of public display or collection;
>
> (I) a park, zoo, amusement park, or other place of recreation;
>
> (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
>
> (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
>
> (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7).

Furthermore, pursuant to Congress' grant of authority to the Attorney General to issue regulations to carry out the ADA, the applicable federal regulations also define a "place of public accommodation" as "a facility, operated by a private entity, whose operations affect commerce and fall within at least one of the

[twelve (12) enumerated categories set forth in 42 U.S.C. § 12181(7).]" 28 C.F.R. § 36.104.[5] Section 36.104 defines "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 36.104. In interpreting the plain and unambiguous language of the ADA, and its applicable federal regulations, the Eleventh Circuit has recognized Congress' clear intent that Title III of the ADA governs solely access to physical, concrete places of public accommodation. Rendon, 294 F.3d at 1283-84; Stevens v. Premier Cruises, Inc., 215 F. 3d 1237, 1241 (11th Cir. 2000) (noting that "[b]ecause Congress has provided such a comprehensive definition of 'public accommodation,' we think that the intent of Congress is clear enough"). Where Congress has created specifically enumerated rights and expressed the intent of setting forth "clear, strong, consistent, enforceable standards," courts must follow the law as written and wait for Congress to adopt or revise legislatively-defined standards that apply to those rights. Here, to fall within the scope of the ADA as presently drafted, a public accommodation must be a physical, concrete structure. To expand the ADA to cover "virtual" spaces would be to create new rights without well-defined standards.

Notwithstanding the fact that the plain and unambiguous language of the statute and relevant regulations does not include Internet websites among the definitions of "places of public accommodation," Plaintiffs allege that the southwest.com website falls within the scope of Title III, in that it is a place of "exhibition, display and a sales establishment." (Compl. ¶9). Plaintiffs' argument rests on a definition they have created by selecting language from three separate statutory subsections of 42 U.S.C. § 12181(7). See 42 U.S.C. §§ 12181(7)(C), (H) & (E).[6] While Plaintiffs can, as advocates, combine general terms from three

---

[5] The Court may consider the C.F.R. definitions, as Congress specifically directed the Attorney General to "issue regulations in an accessible format to carry out the provisions of [the ADA]... that include standards applicable to facilities and vehicles covered under section 12182 of [the ADA.]" 42 U.S.C. § 12186(b).

[6] Plaintiffs created their definition from the following italicized language in three subsections of 42 U.S.C. § 12181(7):
"a motion picture house, theater, concert hall, stadium, or other *place of exhibition* or entertainment," 42 U.S.C. § 12181(7)(C);
"a museum, library, gallery, or other place of public *display* or collection," 42 U.S.C. § 12181(7)(H); and

separate statutory subsections, and apply them to an unenumerated specific term, namely Internet websites, the Court must view these general terms in the specific context in which Congress placed each of them.

Under the rule of *ejusdem generis*, "where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." Allen v. A.G. Thomas, 161 F.3d 667, 671 (11th Cir. 1998) (quoting United States v. Turkette, 452 U.S. 576, 581-82 (1981)); see also Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 934 (11th Cir. 2000); Sutton v. Providence St. Joseph Medical Ctr., 192 F.3d 826, 834 (9th Cir. 1999). Here, the general terms, "exhibition," "display," and "sales establishment," are limited to their corresponding specifically enumerated terms, all of which are physical, concrete structures, namely: "motion picture house, theater, concert hall, stadium"; "museum, library, gallery"; and "bakery, grocery store, clothing store, hardware store, shopping center," respectively. 42 U.S.C. §§ 12181(7)(C), (H) & (E). Thus, this Court cannot properly construe "a place of public accommodation" to include Southwest's Internet website, southwest.com.

## 2. Plaintiffs Have Not Established a Nexus Between Southwest.com and a Physical, Concrete Place of Public Accommodation

Although Internet websites do not fall within the scope of the ADA's plain and unambiguous language, Plaintiffs contend that the Court is not bound by the statute's plain language, and should expand the ADA's application into cyberspace.[7] As part of their argument, Plaintiffs encourage the Court to follow Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Assoc. of New England, in which the First Circuit broadly held that the ADA's definition of "public accommodation" is not limited to actual physical structures, but includes, *inter alia*, health-benefit plans. Carparts, 37 F.3d 12, 19 (1st Cir. 1994).[8] While

---

"a bakery, grocery store, clothing store, hardware store, shopping center, or other *sales* or rental *establishment*," 42 U.S.C. § 12181(7)(E).

[7] Plaintiffs concede that neither the legislative history of the ADA nor the plain language of the statute and applicable federal regulations, contain any specific reference to the Internet or cyberspace. (Tr., Oct. 16, 2002).

[8] Although Carparts does not explicitly address the issue of whether an Internet website falls within the definition of "public accommodation," Plaintiffs focus on the First Circuit's dicta discussing the public policy reasons for why the ADA's definition of "public accommodations" should be read broadly:
  By including "travel service" among the list of services considered "public accommodations," Congress clearly contemplated that "service establishments" include providers of services which do

application of the broad holding and dicta in Carparts to the facts in this case might arguably require this Court to include Internet websites within the ADA's definition of "public accommodations," the Eleventh Circuit has not read Title III of the ADA nearly as broadly as the First Circuit.[9] See Rendon, 294 F.3d 1279.

In Rendon, a recent Eleventh Circuit case addressing the scope of Title III, a group of individuals with hearing and upper-body mobility impairments sued the producers of the television game show, "Who Wants To Be A Millionaire," alleging that the use of an automated fast finger telephone selection process violated the ADA because it excluded disabled individuals from participating. The district court dismissed the complaint on grounds that the automated telephone selection process was not conducted at a physical location, and therefore, was not a "place of public accommodation" as defined by the ADA. The Eleventh

---

not require a person to physically enter an actual physical structure. Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services. Likewise, one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result.

Carparts, 37 F.3d at 19.

[9] In addition to Carparts, Plaintiffs encourage this Court to follow Doe v. Mutual of Omaha Ins. Co., 179 F.3d 557, 559 (7th Cir. 1999), in which Chief Judge Posner approvingly cited to Carparts and stated in dicta that:

The core meaning of [42 U.S.C. § 12182(a)], plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, [Carparts]),that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.

Plaintiffs also cite to a September 9, 1996 letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, United States Department of Justice, to U.S. Senator Tom Harkin, advising the Senator that "[c]overed entities that use the Internet for communications regarding their programs, goods, or services must be prepared to offer those communications through accessible means as well." (Pl.'s Resp., Exh. A). Finally, Plaintiffs cite the recent unpublished opinion in Vincent Martin et al. v. Metro. Atlanta Rapid Transit Authority, No. 1:01-CV-3255-TWT (N.D. Ga. Oct. 7, 2002), in which U.S. District Judge Thomas W. Thrash, Jr. held that until the Metropolitan Atlanta Rapid Transit Authority ("MARTA") reformats its Internet website in such a way that it can be read by visually impaired persons using screen readers, MARTA is "violating the ADA mandate of 'making adequate communications capacity available, through accessible formats and technology, to enable users to obtain information and schedule service.'" Vincent Martin et al. v. Metro. Atlanta Rapid Transit Authority, No. 1:01-CV-3255-TWT, at 34 (N.D. Ga. Oct. 7, 2002) (quoting 49 C.F.R. § 37.167(f)). That case, however, is distinguishable in one critical respect: Plaintiffs in Vincent Martin filed suit under both the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq., and Title II of the ADA, 42 U.S.C. § 12132, not Title III as in the present case. Title II prohibits qualified individuals from being "excluded from participation in or [being] denied the benefits of the services, programs, or activities of a public entity, or [being] subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA defines "public entity" as "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority...." 42 U.S.C. § 12131. Because the present case deals with Title III, not Title II of the ADA, and Plaintiffs could not allege any facts that would place Southwest within the definition of a "public entity" under Title II, Vincent Martin is inapplicable.

Circuit reversed, holding that the telephone selection process was "a discriminatory screening mechanism...which deprives [the plaintiffs] of the opportunity to compete for the privilege of being a contestant on the [game show]." Rendon, 294 F.3d at 1286. The Eleventh Circuit observed that "[t]here is nothing in the text of the statute to suggest that discrimination via an imposition of screening or eligibility requirements must occur on site to offend the ADA." Id. at 1283-84. Most significantly, the Eleventh Circuit noted that the plaintiffs stated a claim under Title III because they demonstrated "a nexus between the challenged service and the premises of the public accommodation," namely the concrete television studio. Id. at 1284 n. 8.

Plaintiffs contend that the Eleventh Circuit in Rendon aligned itself with the First Circuit in Carparts, and that Rendon requires a broad reading of the ADA to include Internet websites within the "public accommodations" definition. However, these arguments, while emotionally attractive, are not legally viable for at least two reasons. First, contrary to Plaintiffs' assertion that the Eleventh Circuit aligned itself with Carparts, the Eleventh Circuit in Rendon not only did not approve of Carparts, it failed even to cite it.[10]

Second, whereas the defendants in Rendon conceded, and the Eleventh Circuit agreed, that the game show at issue took place at a physical, public accommodation (a concrete television studio), and that the fast finger telephone selection process used to select contestants tended to screen out disabled individuals, the Internet website at issue here is neither a physical, public accommodation itself as defined by the ADA, nor a means to accessing a concrete space such as the specific television studio in Rendon.[11] 294 F.3d at 1284.

---

[10] In fact, the Eleventh Circuit recognized those courts which declined to follow Carparts, noting that "to the extent that a plaintiff intends to raise a claim of disability discrimination based on the kind of insurance offered, the plaintiff must demonstrate that the policy was offered to the plaintiff directly by the insurance company *and was connected with its offices*, as opposed to its being a privilege provided by the plaintiff's employer." Rendon, 294 F.3d at 1284 n. 8 (emphasis added) (citing Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1114-15 (9th Cir. 2000) (noting that "some connection between the good or service complained of and an actual physical place is required); Ford v. Schering-Plough Corp., 145 F.3d 601, 612-13 (3d. Cir. 1998) (noting that "[t]he plain meaning of Title III is that a public accommodation is a place..."); Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1011-14 (6th Cir. 1997) (noting that "[a]s is evident by § 12181(7), a public accommodation is a physical place...")).

[11] In recognizing the requirement that a plaintiff establish "a nexus between the challenged service and the premises of the public accommodation," the Eleventh Circuit noted that the plaintiffs in Rendon stated a claim under Title III of the ADA because they sought "the privilege of competing in a contest held in a *concrete space*..." Rendon, 294 F.3d at 1284 (emphasis added); compare Stoutenborough v. Nat'l Football League, Inc., 59 F.3d 580

Although Plaintiffs contend that this "is a case seeking equal access to Southwest's virtual 'ticket counters' as they exist on-line," (Pl.'s Resp. at 13), the Supreme Court and the Eleventh Circuit have both recognized that the Internet is "a unique medium--known to its users as 'cyberspace'--*located in no particular geographical location* but available to anyone, anywhere in the world, with access to the Internet." Voyeur Dorm, L.C. v. City of Tampa, 265 F.3d 1232, 1237 n.3 (11th Cir. 2001) (quoting Reno v. ACLU, 521 U.S. 844, 851 (1997)). Thus, because the Internet website, southwest.com, does not exist in any particular geographical location, Plaintiffs are unable to demonstrate that Southwest's website impedes their access to a specific, physical, concrete space such as a particular airline ticket counter or travel agency.[12] Having failed to establish a nexus between southwest.com and a physical, concrete place of public accommodation, Plaintiffs have failed to state a claim upon which relief can be granted under Title III of the ADA.[13]

## Conclusion

Accordingly, based upon the foregoing reasons, it is hereby

ORDERED that Defendant Southwest's Motion to Dismiss Plaintiffs' Complaint [DE-11] is

---

(6th Cir. 1995) (holding that hearing impaired plaintiffs, who alleged that National Football League "blackout rule" violated Title III of ADA, failed to state a cause of action, as there was no nexus between televised broadcast of football game and physical place of public accommodation). See also Torres v. AT&T Broadband, LLC, 158 F. Supp. 2d 1035 (N.D. Cal. 2001) (dismissing Title III claim that cable service provider must make a list of available programs accessible to the visually impaired, and holding that "neither the digital cable system nor its on-screen channel menu can be considered a place of public accommodation within the meaning of the ADA"); Access Now, Inc. v. Claire's Stores, Inc., No. 00-14017-CIV-MOORE, 2002 WL 1162422, at *5 (S.D. Fla. May 7, 2002) (noting in approving a Title III class settlement that "[n]o court has held that internet websites made available to the public by retail entities must be accessible").

[12] It is important to note that aircrafts are explicitly exempt from Title III of the ADA. 42 U.S.C. § 12181(10). Plaintiffs do not argue that Southwest's website impedes their access to aircrafts.

[13] Given the number of visually impaired persons who utilize the Internet for commerce, and the significant amount of business that Southwest obtains through its Internet website, it is unfortunate that the parties have not cooperated to develop a creative solution that benefits both parties and which avoids the costs and polarizing effects of litigation. It is especially surprising that Southwest, a company which prides itself on its consumer relations, has not voluntarily seized the opportunity to employ all available technologies to expand accessibility to its website for visually impaired customers who would be an added source of revenue. That being said, in light of the rapidly developing technology at issue, and the lack of well-defined standards for bringing a virtually infinite number of Internet websites into compliance with the ADA, a precondition for taking the ADA into "virtual" space is a meaningful input from all interested parties via the legislative process. As Congress has created the statutorily defined rights under the ADA, it is the role of Congress, and not this Court, to specifically expand the ADA's definition of "public accommodation" beyond physical, concrete places of public accommodation, to include "virtual" places of public accommodation.

GRANTED, and this action is DISMISSED WITH PREJUDICE. All pending motions not otherwise ruled upon are denied as moot, and this case is CLOSED.

DONE and ORDERED in Miami, Florida, this 18th day of October, 2002.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:

Magistrate Judge Ted E. Bandstra

K. Renee Schimkat, Esq.
Garth T. Yearick, Esq.
*Counsel for Defendant Southwest Airlines, Co.*
Carlton Fields, P.A.
4000 Bank of America Tower at Int'l Place
100 SE 2nd St.
Miami, FL 33131
fax 305-530-0055

Steven R. Reininger, Esq.
Howard R. Behar, Esq.
*Counsel for Plaintiffs*
Rasco Reininger Perez & Esquenazi, P.L.
283 Catalonia Ave., 2nd Flr.
Coral Gables, FL 33134
fax 305-476-7102